02-11-262,263-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-11-00262-CR

 

 









 
 
 Joshua
 Salinas
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 367th District
 Court
  
 of
 Denton County (F-2009-1255-E)
  
 December
 13, 2012
  
 Opinion
 by Justice Meier
  
 (nfp)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed. 

 

SECOND DISTRICT COURT OF APPEALS 








 

 

 

 

By_________________________________

   
Justice Bill Meier

 








 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-11-00262-CR

NO. 02-11-00263-CR

 

 


 
 
 Joshua Salinas
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 367th
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          Appellant
Joshua Salinas appeals his two convictions for aggravated robbery.  In four
points, Salinas argues that the trial court erred by denying his motion to
suppress, motion for new trial, and motions for mistrial.  We will affirm.

II.  Background

          On
March 7, 2009, at around 8:00 p.m., a Hispanic male wearing a black
hoodie, black tennis shoes, black gloves, and a camouflage mask approached the
Zoom Zoom’s convenience store in Denton and attempted to open the magnetically locked
door.  When the door failed to open, he shot at it with a silver semi-automatic
handgun, shattering the glass; he entered the store, demanded money from and
threatened to shoot the clerk, and ran off with $70—a $50 bill and a $20 bill. 
A police officer patrolling nearby responded to the robbery and noticed someone
in his vehicle’s mirror wearing a black jacket and running from Zoom Zoom’s.  Authorities
set up a perimeter and began searching for the suspect.

          During
the ensuing search, police discovered a loaded magazine from a pistol in a
nearby yard and a truck parked in a business parking lot across and “a little
ways down” from Zoom Zoom’s.  The truck seemed out of place because it was Saturday
night and the businesses appeared to be closed.  The truck’s hood was warm to
the touch, the doors were unlocked, and officers could see keys and a cell
phone inside.  When police ran the license plate number, they learned that Salinas
owned the truck and that his address was located between .9 and 1.3 miles from
Zoom Zoom’s.  Several officers consequently set up surveillance at Salinas’s
residence in order to either intercept him or to follow someone who might leave
to go meet him.

          The
officers stationed at Salinas’s residence soon observed a male and a female
exit the home, get in a truck, and drive away.  One of the officers, Officer
Murphy, believed that the male was Hector Cavazos, Salinas’s brother.  As police
trailed the truck, the driver drove by the scene of the robbery and slowed
while passing by.  The police performed an “increased risk stop” after the
driver pulled off the road and parked at Vitty’s Bar.  Salinas, not Hector,
exited the passenger side of the vehicle; his sister exited the driver’s side.  Salinas
agreed to speak with investigators at the police station.

          Meanwhile,
several other officers had set up surveillance at Salinas’s residence (after
the previous officers) because they were unsure if Salinas was either inside of
the house or headed back that way.  When someone exited the residence, saw one
of the officers, and quickly returned inside, the officers entered the
residence, performed a protective sweep, and secured the residence until
additional officers arrived later to execute a search warrant.  During the
subsequent search, police collected a pair of black and red tennis shoes and a
box of ammunition for a .380 semi-automatic handgun from Salinas’s room.  Investigators
conducted another search of the area near Zoom Zoom’s the next morning.  During
that search, they discovered a black hoodie, black gloves, and a camouflage
mask in a trash bin.  Police arrested Salinas the same morning.  He had a $50
bill and a $20 bill in his wallet.

          The
State called numerous witnesses at trial.  Bishnu Bhetwal testified that he was
working at Zoom Zoom’s on February 18, 2009, when a person matching
Salinas’s description and wearing a black jacket, gloves, and a mask robbed him
at gunpoint.  Bhetwal recalled that the suspect had told him, “I’ll be back.”

          Salinas’s
former girlfriend reviewed photographs taken from Zoom Zoom’s surveillance
videos and identified Salinas as the person responsible for committing both the
February 18, 2009 and March 7, 2009 robberies.  She also visited
Salinas in jail.  While there, she asked him, “Why are you here?  You are here
because of all of these robberies,” and Salinas responded, “Yeah, I’m sorry; I
got greedy.”

          A
citizen who lived near Zoom Zoom’s testified that she found a silver handgun in
her yard in September 2009.  Authorities matched the gun to the magazine that
was found after the March 7, 2009 robbery and determined that the gun was
used in the second robbery.

          A
forensic scientist testified that Salinas’s DNA matched genetic material found
on the black hoodie and on one of the black gloves.  And one of the officers
who responded to Vitty’s Bar when the police first made contact with Salinas noticed
that his shoes then looked similar to the shoes worn by the suspect in the
February 18, 2009 Zoom Zoom’s robbery.

          The
trial court denied Salinas’s motion to suppress.[2]  A jury subsequently
convicted Salinas for the February 18, 2009 aggravated robbery at Zoom
Zoom’s and assessed his punishment at forty-five years’ confinement and a
$1,000 fine.  The jury also convicted Salinas for the March 7, 2009 aggravated
robbery at Zoom Zoom’s and assessed his punishment at sixty-five years’
confinement and a $1,200 fine.  The trial court sentenced Salinas accordingly.

III.  Motion to Suppress

          In
his first point, Salinas argues that the trial court erred by denying his
motion to suppress.  We review a trial court’s ruling on a motion to suppress
evidence under a bifurcated standard of review.  Amador v. State, 221
S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997).  We give almost total deference to a trial court’s
rulings on questions of historical fact and application-of-law-to-fact
questions that turn on an evaluation of credibility and demeanor, but we review
de novo application-of-law-to-fact questions that do not turn on
credibility and demeanor.  Amador, 221 S.W.3d at 673; Estrada v.
State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson v. State,
68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

          A.      Reasonable
Suspicion

          Salinas
argues that police lacked reasonable suspicion to stop the vehicle that he was
riding in and to detain him.  A detention may be justified on less than
probable cause if a person is reasonably suspected of criminal activity based
on specific, articulable facts.  Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct.
1868, 1880 (1968); Carmouche v. State, 10 S.W.3d 323, 328 (Tex. Crim.
App. 2000).  An officer conducts a lawful temporary detention when he has
reasonable suspicion to believe that an individual is violating the law.  Ford
v. State, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).  Reasonable suspicion
exists when, based on the totality of the circumstances, the officer has
specific, articulable facts that when combined with rational inferences from those
facts, would lead him to reasonably conclude that a particular person is, has
been, or soon will be engaged in criminal activity.  Id.  This is an
objective standard that disregards any subjective intent of the officer making
the stop and looks solely to whether an objective basis for the stop exists.  Id.

          Police
had knowledge of the following facts when they stopped the vehicle that Salinas
was riding in and detained him:

·       
Zoom
Zoom’s had been robbed by an armed gunman for the second time in two months;

 

·       
the
suspect in both robberies was described as a Hispanic male;

 

·       
a
police officer responding to the robbery saw a person running away from Zoom
Zoom’s;

 

·       
officers
discovered a truck parked in a business parking lot nearby Zoom Zoom’s;

 

·       
the
truck was out of place, its hood was warm, and keys and a cell phone were
inside;

 

·       
the
truck was registered to Salinas, who lived between .9 and 1.3 miles from Zoom
Zoom’s and matched the description of the suspect in both robberies;

 

·       
Officer
Murphy thought he observed Salinas’s brother, Hector, get in a truck with a
female and drive away from Salinas’s residence; and

 

·       
the
truck slowed when it drove past the crime scene.

          These
facts—and the rational inferences that the officers could have made based upon
the facts—could have led officers to reasonably conclude that the individuals
who departed Salinas’s residence in the truck were attempting to collect
Salinas, who was on foot after the robbery because he was unable to return to
his truck parked nearby Zoom Zoom’s.  Indeed, two officers confirmed that they
followed the truck because they thought the persons inside were driving
somewhere to pick up Salinas.  As it turns out, Salinas was in the truck.  We
hold that officers had, at a minimum, reasonable suspicion to detain Salinas. 
The trial court did not err by denying Salinas’s motion to suppress on this
ground.  We overrule this part of Salinas’s first point.

          B.      Protective
Sweep 

          Salinas
argues that the protective sweep performed by the officers who secured Salinas’s
residence was “unreasonable and unnecessary with the use of firearms.”  A valid
protective sweep must meet each of the following five requirements:  (1) police
must have entered or remained in the home legally; (2) police presence in
the home must be for valid law enforcement purposes; (3) the sweep must be
supported by a reasonable, articulable suspicion that the area harbors an
individual who poses a danger to those on the scene; (4) the sweep may be
no more than a cursory inspection of that area where such an individual may be
found; and (5) the sweep may last only long enough to dispel the
reasonable suspicion of danger and may not last longer than the police are
justified in remaining on the premises.  Reasor v. State, 12 S.W.3d 813,
816–17 (Tex. Crim. App. 2000); see United States v. Gould, 364 F.3d 578,
587 (5th Cir.), cert. denied, 543 U.S. 955 (2004); Cooksey v. State,
350 S.W.3d 177, 185–87 (Tex. App.—San Antonio 2011, no pet.).  Probable cause
coupled with exigent circumstances may justify a warrantless entry into a
residence.  Estrada v. State, 154 S.W.3d 604, 608 (Tex. Crim. App.
2005); see Parker v. State, 206 S.W.3d 593, 596–601 (Tex. Crim.
App. 2006) (explaining probable cause to cross threshold of private residence);
McNairy v. State, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991) (listing
preventing destruction of evidence or contraband as an exigent circumstance).

          Officer
Acrey testified that he went to Salinas’s residence because “[a]t the time
there was a robbery where shots were fired at a local business, and the suspect
in the robbery may or may not have been in that house.  They weren’t exactly
sure at the time, so I was sent there to keep an eye on the house.”  After he
arrived, someone exited the residence, saw him, and quickly returned inside.  Both
Officer Acrey and Officer Lane, the other officer there, explained that they
entered the residence because of their concern that someone inside could
potentially destroy evidence relevant to the armed robbery.  Officer Acrey
testified that they also entered the house out of a concern for their own
safety:  “It might be either, A, the suspect going back in because they saw us
or, B, going back in to tell the suspect that we’re out there or, hey, look
out.  It’s a many number of reasons, but those to me are the main two:  Might
be tipping somebody off, or it might be our suspect.”  Once inside, with
knowledge that an armed robbery had occurred, Officer Acrey took a few minutes
to perform a protective sweep of the residence, only looking in areas where a
person could be found.  Officer Lane explained, “I don’t want somebody coming
down the stairs while I’m watching people in the living room and catch me off
guard.”  Officer Lane agreed with the State’s observation that “dangerous
people tend to associate with other dangerous people.”

          Viewing
these and all of the other relevant facts in the light most favorable to the
trial court’s ruling, we hold that officers had probable cause supported by
exigent circumstances to enter Salinas’s residence and that they were justified
in performing a protective sweep.  We overrule this part of Salinas’s first
point.

          C.      Search
Warrant

          Salinas
argues that the search warrant affidavit was defective because although Officer
Murphy testified at trial that he thought he had observed Hector leaving
Salinas’s house, the affidavit stated that Officer Murphy thought that Salinas
had left the residence.  When reviewing an affidavit’s sufficiency and a
magistrate’s determination of probable cause, we limit our review to the totality
of the circumstances within the four corners of the affidavit and defer to the
magistrate’s probable cause determination “so long as the magistrate had a
‘substantial basis for . . . conclud[ing]’ that a search
would uncover evidence of wrongdoing.”  Illinois v. Gates, 462 U.S. 213,
236, 103 S. Ct. 2317, 2331 (1983) (citing Jones v. United States,
362 U.S. 257, 271, 80 S. Ct. 725, 736 (1960), overruled on other
grounds by United States v. Salvucci, 448 U.S. 83, 100 S. Ct. 2547
(1980)); Swearingen v. State, 143 S.W.3d 808, 810
(Tex. Crim. App. 2004); Jones v. State, 833 S.W.2d 118, 123
(Tex. Crim. App. 1992), cert. denied, 507 U.S. 921 (1993)); see also
Flores v. State, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010).

          The
misstatement in the affidavit that Officer Murphy observed Salinas instead of
Hector leaving Salinas’s residence was likely inadvertent but also harmless.  In
light of all of the other information contained in the affidavit, the
magistrate had a substantial basis to conclude that probable cause existed.  Salinas
does not assert any argument under Franks v. Delaware, 438 U.S. 154,
155–56, 98 S. Ct. 2674, 2676 (1978) (addressing false statement in
affidavit made either knowingly, intentionally, or with reckless disregard for
the truth).  We overrule the remainder of Salinas’s first point.

IV.  Motion for New Trial

          In
his second point, Salinas argues that the trial court committed reversible
error by denying his motion for new trial complaining of a purported Brady
violation.

          We
review the denial of a motion for new trial for an abuse of discretion.  Lewis
v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995).  “We do not substitute
our judgment for that of the trial court; rather, we decide whether the trial
court’s decision was arbitrary or unreasonable.”  Holden v. State, 201
S.W.3d 761, 763 (Tex. Crim. App. 2006).  A trial court abuses its discretion in
denying a motion for new trial when no reasonable view of the record could
support the trial court’s ruling.  Id.

          The
State has an affirmative duty to disclose exculpatory evidence that is material
either to guilt or punishment.  Brady v. Maryland, 373 U.S. 83, 87–88, 83
S. Ct. 1194, 1197 (1963).  The State’s duty to reveal Brady
material attaches when the information comes into its possession, not when it
is requested.  Thomas v. State, 841 S.W.2d 399, 407 (Tex. Crim. App.
1992).  To establish a due process violation under Brady, a defendant
must show the following:  (1) evidence was suppressed; (2) the
suppressed evidence was favorable to the defendant; and (3) the suppressed
evidence was material to either guilt or punishment.  Hampton v. State,
86 S.W.3d 603, 612 (Tex. Crim. App. 2002).

          Here,
when defense counsel questioned one of the investigators about a sequence of
events relevant to the March 7, 2009 robbery, the investigator explained
that he could not give a precise answer because he did not have the police’s “radio
log” in front of him.  At some point during the investigator’s testimony, the
State provided defense counsel with a copy of the radio log, which showed that
police had Salinas in custody approximately twenty minutes before the
protective sweep of his house occurred.  Defense counsel later moved for a
mistrial, arguing that had the State turned over the radio log earlier, he could
have used the information detailed therein to help demonstrate during the
hearing on his motion to suppress that the protective sweep was unnecessary because
police already had Salinas in custody.  The trial court denied the motion,
pointing out that there was evidence of a second suspect that had not been
apprehended when police entered Salinas’s residence.  Salinas filed a motion
for new trial raising the same argument.

          The
trial court’s recollection about evidence of a second suspect was accurate.  Officer
Lane testified that he had information about a second, Hispanic suspect who
“may already” have been at Salinas’s residence.  Although he could not recall a
name, the record demonstrates that the second suspect could only have been
Hector, Salinas’s brother.  Indeed, Officer Murphy testified that he was
familiar with both Salinas and Hector because of previous encounters with both and
that they lived together.  When Officer Behrens explained what he believed to
be the reasonable suspicion to stop the vehicle that Salinas was riding in and
detain him, he mentioned that police had two suspects in mind:

          A.    We
had this vehicle leaving the address that we knew that both Hector
Cavazos and Joshua Salinas were related to. . . .  So with the
information from the suspicious vehicle that was still warm and suspicious
location, unlocked with the cell phone inside and the keys, that comes back to
an address that we have two people that potentially meet -- you
know, that do meet the description of the suspect, and then we have one of
them leaving with another one of them in this vehicle --

 

          Q.    Okay.

 

          A.    -- and
go -- and drive right through the area where this robbery occurred.

 

          Q.    Okay.   Possibly
to pick up Joshua Salinas; is that correct?

 

          A.    Or vice versa.  That could have been
Joshua Salinas going to pick up Hector.  [Emphasis added.]

Excerpts
from the radio log support the officers’ testimony.  Just after police detained
Salinas, one of the officers radioed, “We still looking for other guy who is
not accounted for, he is the brother, that’s why we need eyes on Collins
address.”  Shortly thereafter, another officer radioed, “Right now we don’t
know which one is the main susp.  We have Josh at Teasley//Londonderry, U go to
Collins.”

          Thus,
although police eventually determined that Salinas was responsible for
committing the aggravated robberies, in the immediate aftermath of the March 7,
2009 robbery and with the limited information available at the time, police
were concerned with two suspects, not just one.  Because there was more than
one suspect when Salinas was stopped, evidence that he was stopped
approximately twenty minutes before police conducted the protective sweep was insignificant
as to whether the protective sweep was legally justified.  Because the trial
court could have reasonably concluded that the alleged Brady evidence
was neither favorable nor material to Salinas’s defense, we hold that the trial
court did not abuse its discretion by denying Salinas’s motion for new trial. 
We overrule Salinas’s second point.

V.  Motions for Mistrial

          A.      Extraneous
Offenses and Marijuana/Drug Paraphernalia

          In
part of his third point, Salinas argues that the trial court erred by denying his
motion for mistrial complaining of extraneous offense evidence unintentionally
elicited by the State.  Specifically, Officer Keith Smith testified that police
took photographs of various items of clothing during the search of Salinas’s
residence because “we were investigating four separate robberies that we
thought might be related, so we’re looking for -- we had
documentation of clothing related to all of these.”  [Emphasis added.]  Salinas
complained about the extraneous offense evidence—explaining that he was on
trial for only two robberies—and moved for a mistrial.  The trial court denied
the motion but instructed the jury to disregard the officer’s testimony about
the robberies.

          In
the other part of his third point, Salinas argues that the trial court erred by
denying his motion for mistrial complaining of Officer Krouskup’s testimony
that police discovered marijuana and drug paraphernalia during the search of
Salinas’s residence.

          When
the trial court sustains an objection and instructs the jury to disregard but
denies a defendant’s motion for mistrial, the issue is whether the trial court
abused its discretion by denying the mistrial.  Hawkins v. State, 135
S.W.3d 72, 76–77 (Tex. Crim. App. 2004).  A mistrial is required only in
extreme circumstances—when the prejudice caused by the improper question and
answer is incurable, i.e., “so prejudicial that expenditure of further time and
expense would be wasteful and futile.”  Ladd v. State, 3 S.W.3d 547, 567
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1070 (2000).  In most
instances, an instruction to disregard will cure the alleged harm.  Wesbrook
v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), cert. denied,
532 U.S. 944 (2001).  We consider the following factors in determining whether
the trial court abused its discretion by denying a motion for mistrial:  (1) the
severity of the misconduct, (2) curative measures, and (3) the
certainty of conviction absent the misconduct.  Hawkins, 135 S.W.3d at
77; Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on
reh’g), cert. denied, 526 U.S. 1070 (1999).

          Regarding
Officer Smith’s uninvited testimony about four robberies, there is nothing in
the record to indicate that the jury was unable to abide by the trial court’s
instruction to disregard.  Considering each of the Hawkins factors, we
hold that the trial court did not abuse its discretion by denying Salinas’s
motion for mistrial on this ground.  We overrule this part of Salinas’s third
point.

          Regarding
Officer Krouskup’s testimony that marijuana and drug paraphernalia were found
in Salinas’s residence, there is nothing in the record to show that those items
belonged to Salinas—unlike with the ammunition, there was no testimony that the
items were found in his bedroom, but there was evidence that several other
people, including Hector, lived in the residence.  Considering each of the Hawkins
factors, we hold that the trial court did not abuse its discretion by denying
Salinas’s motion for mistrial on this ground.  We overrule the remainder of
Salinas’s third point.

          B.      Jail
Time Pending Trial

          In
his fourth point, Salinas argues that the trial court erred by denying a motion
for mistrial that he filed early on the first day of trial.  Salinas moved for
a mistrial because he learned that a docket sheet posted outside of the
courtroom indicated that he had served 754 days in jail pending trial.  The
trial court consequently asked each juror, individually, the following
question:  “At any time prior to today, did you see, read any document,
overhear, view, or become involved in any conversation or discussion regarding
this Defendant?”  All twelve jurors answered in the negative.  Because there is
no evidence that any of the jurors noticed the docket sheet, Salinas’s argument
rests upon mere speculation.  We hold that the trial court did not abuse its
discretion by denying the motion for new trial.  See Payne v. State, No.
02-09-00100-CR, 2010 WL 1730857, at *4–5 (Tex. App.—Fort Worth Apr. 29,
2010, pet. ref’d) (mem. op., not designated for publication) (holding that
trial court did not abuse its discretion by denying motion for mistrial
complaining about docket sheet posted in courthouse that stated appellant was
being tried for DWI second).  We overrule Salinas’s fourth point.

VI.  Conclusion

          Having
overruled each of Salinas’s points, we affirm the trial court’s judgments.

 

 

BILL MEIER
JUSTICE

 

 

PANEL: 
DAUPHINOT,
GARDNER, and MEIER, JJ.

 

DAUPHINOT,
J., dissents without opinion.

 

GARDNER,
J., concurs without opinion.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  December 13,
2013









[1]See Tex. R. App. P. 47.4.





[2]The trial court announced
its ruling on the record but did not make express findings of fact and
conclusions of law.